861 A.2d 194 (2004)
373 N.J. Super. 302
Paul A. ORAS, Plaintiff-Appellant,
v.
The HOUSING AUTHORITY OF the CITY OF BAYONNE; John T. Mahon; Trisha Karahuta; Ava Mitchell, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 2004.
Decided November 29, 2004.
*196 Mark J. Russell argued the cause for appellant.
Jeanette M. Samra-Arteaga argued the cause for respondents (Fitzpatrick & Waterman, attorneys; Ms. Samra-Arteaga, on the brief).
Before Judges CONLEY, BRAITHWAITE and WINKELSTEIN.
*197 The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiff, Paul Oras, is a forty-eight-year-old paraplegic who suffered lower extremity paralysis in a motorcycle accident in 1977. He appeals from a June 20, 2003 summary judgment that dismissed his complaint alleging violations of state and federal disability discrimination laws by defendant Bayonne Housing Authority (the Authority) and its employees. He claims the Authority discriminated against him by not providing him with a handicap-accessible apartment, and by not permitting him to keep a dog that he claims assisted him with his daily activities. We reverse.
We glean the following facts from the record. The Authority administers funds provided by the United States Department of Housing and Urban Development (HUD) for rental assistance programs including a program known as "Low Income Public Housing" and another known as "Section 8 Voucher Rental Assistance." Admission to one program does not give an individual the automatic right to admission to the other; an application for the desired program must be submitted and approved.
The Authority owns an apartment building in Bayonne, known as Backbay Gardens, which leases to tenants who participate in the low income program. Backbay Gardens is adjacent to another apartment building, Post Road Gardens, which is owned by a private non-profit organization and managed by the Authority. Plaintiff was a resident in Post Road Gardens, where the tenants are participants in the Section 8 program. He lived alone.
On August 31, 1994, plaintiff, then thirty-eight years old and wheelchair-bound as a result of his motorcycle accident, applied to become a tenant in Post Road Gardens. He met with defendant Trisha Karahuta, an Authority representative, on April 26, 1995. She told him a studio apartment was available for immediate rental, but he would have to take it "sight unseen." Karahuta told him the apartment was not handicap-accessible, but was nonetheless suitable for him because it had large doorways.
She also told him that construction on wheelchair-accessible, barrier-free apartments would start in the spring and he would be "number one" on the list for such an apartment. Plaintiff testified at his deposition that Karahuta said: "Mr. Oras, beginning in the spring, I have good news for you. We are going to be renovating apartments in the housing projects, and you will be the first one on the list." Although Karahuta did not specify in which building this construction would take place, plaintiff assumed that by "housing projects," she was referring to both Post Road Gardens and Backbay Gardens.
The next day, plaintiff executed a lease for the efficiency apartment in Post Road Gardens. The lease did not contain a pet policy, but did state:
The [Authority] Tenant Handbook contains a more detailed description of the rules and regulations of the Authority and [HUD], and of Tenant's rights and duties. A copy of the Handbook is available from the Authority Office. The contents of the Handbook are specifically made part of this Lease.
One of the regulations included in the Handbook was a pet policy, which permitted "senior citizens or handicapped persons, with certain restrictions, to harbor domesticated animals in their dwelling unit." Dogs were limited to those that did not "exceed 20 pounds in weight...." Before acquiring a pet, a tenant was required *198 to apply for a pet permit and present a health certificate for the animal; and pay the Authority a refundable deposit equal to one month's rent to cover potential damage to the apartment by the pet.
When plaintiff moved into his apartment, he brought with him his Labrador named "Jesse." Plaintiff did not obtain a pet permit for Jesse; he claimed that he was unaware of the policy. He explained that he asked other tenants about the Authority's position regarding pets, and they told him that dogs were permitted.
A month after Jesse died in May 1995, plaintiff's sister gave him a new dog, "Peaches," who weighed approximately forty-seven pounds. According to plaintiff, his niece had trained Peaches to assist him in his daily living, as Jesse had done. The dog would retrieve plaintiff's keys from the floor, and would pull him back from the supermarket when his arms were laden with groceries and he was unable to operate his manual wheelchair. Plaintiff did not apply for a permit for Peaches.
In June 1996, plaintiff received a letter from the Authority advising that it had learned he was "harboring a dog in [his] apartment." Because Peaches exceeded the weight limit, defendant Ava Mitchell, the Authority's Director of Staff Operations, informed plaintiff on July 3, 1996, that Peaches had to be removed from his apartment by July 17, 1996. In response, plaintiff requested an exception to the pet policy. He submitted letters from two doctors, each stating it was medically necessary for him to keep Peaches. Dr. Mark Filippone said Peaches had been trained to assist plaintiff in his daily life. Dr. Jacob Jacoby wrote that Peaches was a "therapeutic aid" to plaintiff's continued well-being and plaintiff's emotional health could be compromised if he were forced to give up the dog. Notwithstanding these letters, on July 19, 1996, Mitchell denied plaintiff's request to keep the dog. She gave plaintiff until August 1, 1996, to remove Peaches from his apartment.
On July 25, 1996, plaintiff wrote to defendant John Mahon, the Authority's Executive Director, and renewed his request that the Authority make an exception for Peaches. Plaintiff wrote:
I am a handicapped individual, a paraplegic confined full-time to a manually-operated wheelchair. I have a canine companion, "Peaches," a 4 year old black Labrador female weighing about 42 lbs. This dog is described in the attached letter from Dr. Mark Filippone to [the Authority] dated July 6, 1996. Dr. Filippone's credentials are impressive and impeccable in the field of rehabilitation medicine: he is an expert. My dog is also referred to in a letter (also attached) to the [Authority] from Dr. Jacob Jacoby, dated July 11, 1996. Dr. Jacoby is also a qualified expert authority and had determined that Peaches is a major contributing factor to my present and future well-being.
To sum up the findings of these two medical authorities, the dog, Peaches, is a vital part of my physical and psychological well-being and on-going recovery. She is to be considered a Canine Companion, not just a pet. To remove her from my apartment would be analogous to removing a seeing eye dog from a blind person.
Relying upon the Authority's pet policy, on August 2, 1996, Mahon advised plaintiff to remove the dog by August 20.
Plaintiff subsequently submitted a notarized statement confirming that Peaches was no longer residing in his apartment. He also included a petition, with 171 signatures, requesting that the Authority make an exception to its policy and permit him to keep the dog.
*199 On November 27, 1996, plaintiff fell and fractured his right hip in his apartment while trying to maneuver from his wheelchair onto the toilet. This accident, and plaintiff's subsequent fall caused by a newly-installed speed bump in the apartment complex's parking lot on December 24, 1996, formed the basis for a lawsuit plaintiff filed against the Authority. In that suit, plaintiff contended he fell in the bathroom as a result of the room's inadequate size and the Authority's failure to install grab bars near the toilet. Plaintiff alleged he fell in the parking lot because the Authority failed to post warning signs of the speed bumps. The case settled by the Authority paying plaintiff $250,000.[1]
Following surgery to repair his hip, plaintiff spent several weeks at the Kessler (rehabilitation) Institute. Prior to his discharge in December 1996, his physician, Dr. Robert J. Klecz, wrote to Mahon and Karahuta:
Paul Oras has been under my care as an inpatient at Kessler Institute from 12/9/96 [un]til the present, following an open reduction internal fixation of a comminuted intertrochanteric hip fracture on the right, which occurred on 11/27/96.
Currently, he is medically stable and appropriate for discharge.... However, it is my understanding that he lives in a studio apartment which may be insufficient for purposes of mobility, including wheelchair propulsion and transfers at a safe level. It is also my understanding that a barrier-free one bedroom apartment at [Backbay Gardens] is currently available. In my opinion, it would be best for this patient to live in such quarters, as it is anticipated that he will be requiring additional equipment for therapeutic purposes. If he were to be denied such quarters and were to remain in his current apartment, he would suffer unnecessary hardships.
Plaintiff's attorney and another Kessler physician, Dr. Elinor Cohen, also sent letters on plaintiff's behalf requesting that he be transferred to a handicap-accessible apartment. Plaintiff made similar requests. He spoke with Karahuta several times over the years regarding the construction of the barrier-free apartments she mentioned during their first meeting, and he expressed his continued interest in obtaining one.
By letter dated April 23, 1998, Mahon said he was aware of plaintiff's request, but at that time, "construction on the handicapped units [had] stopped. There [was] no way to determine when the renovations [would] resume and the completion of these units." In a subsequent deposition, Mahon insisted, however, that regardless of plaintiff's transfer requests from his attorney and his doctors, plaintiff would not have been placed on the waiting list for a handicap-accessible apartment at Backbay Gardens, which administered the low income public housing rental assistance program, because he never submitted an application to be admitted into that program as required by HUD regulations. Mahon admitted that tenants who were not handicapped resided in the handicap-accessible apartments at Backbay Gardens; but, he asserted that no handicap-accessible apartments were available at Post Road Gardens. He claimed that although the Authority was responsible for Post Road Gardens's day-to-day management, because the Authority did not own that apartment building, it was not responsible for constructing handicap units in it.
*200 Against this factual backdrop, plaintiff claims defendants discriminated against him in violation of a federal statute, the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act, 42 U.S.C.A. § 3601 to § 3619 (collectively, the FHAA); and a state statute, the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.[2] He argues the Authority discriminated against him by failing to provide him with a handicap-accessible apartment, and by forcing him to remove his dog.
The FHAA is remedial legislation. Alexander v. Riga, 208 F.3d 419, 425 (3d Cir.2000), cert. denied, 531 U.S. 1069, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). An allegation that a public entity violated the FHAA is a "statutory form of action," where an aggrieved person may file a civil suit to obtain relief from the "discriminatory housing practice." Id. at 427 (citing 42 U.S.C.A. § 3613(a)(1)(A)). As defined in the FHAA, discriminatory housing practices in connection with the rental of a dwelling include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...." 42 U.S.C.A. 3604(f)(3)(B).
Federal regulations encourage the accommodation of persons with disabilities. "For all aspects of the lease ... a handicapped person shall be provided reasonable accommodations to the extent necessary to provide the handicapped person with an opportunity to use and occupy the dwelling unit equal to a non-handicapped person." 24 C.F.R. § 966.7(a). In addition, "[t]he [Public Housing Authority] shall provide a notice to each tenant that the tenant may, at any time during the tenancy, request reasonable accommodation of a handicap of a household member, including reasonable accommodation so that the tenant can meet lease requirements or other requirements of tenancy." 24 C.F.R. § 966.7(b).
As to plaintiff's State cause of action, the LAD prohibits discrimination by a public entity on the basis of a tenant's disability. "It shall be unlawful discrimination for a ... civil or political subdivision of the State of New Jersey, or an officer, employee, or agent thereof, to exercise the power to regulate land use or housing in a manner that discriminates on the basis of... disability." N.J.S.A. 10:5-12.5(a). It is unlawful for any person to "[r]efuse to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-3.4(f)(2). It is also noteworthy that, under N.J.A.C. 13:13-3.4(c),
[i]t is unlawful for any person to ... refuse to ... rent or lease any real property to a person because he or she is a person with a disability who is accompanied by a guide or service dog or animal. Policies which restrict the availability of housing accommodations to persons without pets shall be void with respect to the above-mentioned segment of this protected class.
A handicapped tenant alleging a wrongful denial of a requested accommodation bears the initial burden of showing that the requested accommodation is or *201 was necessary to afford him or her an equal opportunity to use and enjoy a dwelling. Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Township of Scotch Plains, 284 F.3d 442, 457 (3d Cir.2002). Upon such a showing, the burden of proof shifts to the landlord to show that the requested accommodation is or was unreasonable. Ibid.
Given this legal framework, we first consider plaintiff's argument that the court erred when it dismissed his claim for disability discrimination based on the Authority's failure to provide him with a handicap-accessible apartment. The judge reasoned that because plaintiff failed to submit an application to enroll in the low income housing program, which was a necessary precondition to become a tenant at Backbay Gardens, the Authority did not discriminate against plaintiff by not providing him with a handicap-accessible unit. While we agree with the motion judge that plaintiff failed to submit an application to be admitted into the low income rental assistance program, that does not dispose of plaintiff's claim.
Plaintiff asserts Karahuta promised him a handicap-accessible apartment prior to signing the lease. She told him he would be "number one" on the list for such a unit. Mahon was also aware of plaintiff's request for a handicap-accessible apartment. He received plaintiff's doctors' letters, and acknowledged plaintiff was waiting for such a unit when he said, in his April 1998 letter to plaintiff, "construction on the handicapped units [had] stopped. There [was] no way to determine when the renovations [would] resume and the completion of these units." Under these circumstances, plaintiff's position is that if such a unit was only available in Backbay Gardens, and if he was obligated to complete an application to obtain such a unit, the Authority should have so informed him, and its failure to do so was a failure to reasonably accommodate his disability. The motion judge did not address this issue.
Another question unanswered by the Law Division is whether plaintiff was entitled to a handicap-accessible unit in Post Road Gardens, where he did reside. In the second count of his complaint, plaintiff asserted that the Authority, as the entity responsible for management of Post Road Gardens, failed to comply with regulations that govern facilities for physically handicapped persons in public buildings. Although the Authority does not own that building, it does manage it, and receives federally-funded Section 8 money. That being the case, plaintiff maintains that the Authority's failure to abide by the regulations was an unlawful discriminatory housing practice. The Law Division did not address this issue either.
Although these issues remain unresolved, we do not consider the present record sufficient to permit us to decide them. Consequently, as to whether the Authority discriminated against plaintiff by not providing him with a handicap-accessible apartment, either in Post Road Gardens or Backbay Gardens, we reinstate plaintiff's complaint and remand to the trial court for further proceedings. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)(appellate court should not pass on issues not properly presented to trial court).
We next turn to whether the Authority failed to reasonably accommodate plaintiff's need for his dog. In granting summary judgment, the motion judge found:
With regard to whether or not there was a genuine issue of fact regarding whether plaintiff's claims that the [Authority] forced him to remove his dog *202 from his unit are barred by his breach of lease, the Court finds that the [Authority]'s pet policy requires tenants not to maintain any pets in the apartment in violation of set policy except in  in very exceptional or limited circumstances. That pet policy is attached to the 1995 lease, although plaintiff denies that. The Court finds otherwise.
The [Authority's] pet policy limits the weight of a dog to 20 pounds. Here the plaintiff [ac]quired a dog that clearly by his own admission from his own dep[osition] testimony weighed 47 pounds. Plaintiff also stated that he did not notify the [Authority] that he had acquired a dog and he did not request the [Authority]'s permission to have a dog in his apartment or obtain a permit from the [Authority] for the dog, again all of that from the dep[osition] testimony.
Thus, plaintiff's claims [that] ... the [Authority] forced him to remove his dog from the unit are barred by his breach of the lease, as he was in violation of his lease.
We do not find this reasoning to be availing. The judge made a finding of a disputed fact: he concluded that plaintiff was aware of the pet policy, even though he denied it. The judge said: "That pet policy is attached to the 1995 lease, although plaintiff denies that. The Court finds otherwise." That was an inappropriate finding on summary judgment. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)(motion judge not to decide genuine issues of material fact).
Nonetheless, even were it established that plaintiff was aware of the pet policy at the time he entered into the lease, that does not mean that he would be precluded from keeping a pet in his unit if he needed the pet to accommodate his disability. Despite its pet policy, the Authority remains obligated to accommodate plaintiff's disability "to the extent necessary to provide the handicapped person with an opportunity to use and occupy the dwelling unit equal to a non-handicapped person." 24 C.F.R. § 966.7(a); see also N.J.A.C. 13:13-3.4(f)(2)(unlawful to refuse to reasonably accommodate, if accommodation necessary to afford person with disability "equal opportunity to use and enjoy a dwelling"). A landlord may not relieve itself of those responsibilities by having a tenant waive his right to a reasonable accommodation of his disability in a lease. Here, the judge's conclusion  that plaintiff had no right to keep a forty-seven-pound dog in his apartment because to do so would have breached his lease agreement  had just that result. The court placed plaintiff's contractual responsibilities under the lease ahead of the Authority's obligation under state and federal law to accommodate plaintiff's disability.
Whether a pet is of sufficient assistance to a tenant to require a landlord to relax its pet policy so as to reasonably accommodate the tenant's disability requires a fact-sensitive examination. Although no reported case in this State has addressed this question, the federal courts have. In Bronk v. Ineichen, 54 F.3d 425 (7th Cir.1995), the plaintiff-tenants, who were deaf, appealed from a jury verdict in favor of the defendant-landlord, who refused to permit the plaintiffs to keep a dog in their rental unit. Evidence conflicted regarding whether the dog was "a hearing dog providing needed assistance to the plaintiffs...." Id. at 429. Reversing the defense verdict, the court analyzed the legal requirements for a reasonable accommodation with respect to hearing dogs under the FHAA. Ibid.
A "reasonable accommodation does not entail an obligation to do everything *203 humanly possible to accommodate a disabled person; cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." Ibid. The requested accommodation must "enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." Ibid. The court explained:
The accommodation must facilitate a disabled individual's ability to function, and it must survive a cost-benefit balancing that takes both parties' needs into account. On one side of the equation is the degree to which [the dog] aids the plaintiffs in coping with their disability. Professional credentials may be part of that sum; they are not its sine qua non. Plaintiffs must have been allowed to argue that by the dint of [plaintiff's brother's] efforts, [the dog] accumulated enough skills so that he could actually aid in the daily functions of a deaf person.
[Id. at 431.]
A similar approach was taken in Green v. Housing Authority of Clackamas County, 994 F.Supp. 1253 (D.Or.1998), where tenants, a mother and son, sued a county housing authority for refusing to allow them to keep a dog as a hearing assistance animal for the son, who suffered from deafness. The plaintiffs sued under the Fair Housing Act and the Americans with Disabilities Act after the defendant denied their application for a waiver of a lease prohibition on pets and instituted eviction proceedings against them. Id. at 1254-55.
In granting summary judgment for the plaintiffs, the district court rejected the defendant's argument that "the dog was not an appropriate accommodation for the [disabled plaintiffs] because the plaintiffs were unable to produce any `verification' that the dog was a `certified' hearing assistance trained animal." Id. at 1255. Rather, the Green court found that an assistance animal be professionally trained or certified is not required. Id. at 1256 (citing Bronk, supra, 54 F.3d at 430-31). Because no dispute existed that waiving the no-pets policy would not have unduly burdened the defendant, and the record established that the dog was trained to alert the disabled son to several sounds (knocks at the door, smoke detector, phone ringing), the court granted summary judgment to the plaintiffs. Id. at 1257.
A broad view of animals as a "reasonable accommodation" was taken in Janush v. Charities Housing Development Corp., 169 F.Supp.2d 1133 (N.D.Cal.2000), where the court denied the defendant-landlord's motion to dismiss the plaintiff's FHAA claim. The plaintiff claimed the defendant violated that act by refusing her request to waive a "no pets" clause in a rental agreement so as to permit her to keep two birds and two cats that, according to her treating psychiatrist, lessened the effects of the plaintiff's "severe mental health disability" by providing her with companionship. Id. at 1134. In denying the defendant's motion to dismiss, the Janush court rejected the defendant's contention that accommodation of animals other than service dogs is per se unreasonable. Id. at 1135-36. Noting the "highly fact-specific" nature of the reasonable accommodation inquiry, the court said the inquiry should include the likely costs or administrative burdens to be incurred by the defendants in accommodating the animals. Id. at 1136. Those costs or burdens could then be balanced against the benefit of the requested accommodation to the plaintiff to assess whether that accommodation was reasonable under the act. Ibid.
Here, as noted, the motion judge simply focused upon the Authority's pet policy when he dismissed plaintiff's claim. The court failed to give consideration to plaintiff's needs. A reasonable accommodation *204 "means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual." Oxford House, Inc. v. Township of Cherry Hill, 799 F.Supp. 450, 462, n. 25 (D.N.J.1992). That is exactly what plaintiff was seeking when he requested that the Authority relax its policy of limiting dogs to twenty pounds, and allow him to keep his forty-seven-pound dog, which two doctors indicated would assist his physical and mental well being.
Accordingly, we reverse the summary judgment and return the case to the Law Division. On remand, plaintiff must prove that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy his dwelling. If it was, defendant may be relieved of providing the requested accommodation if it proves the accommodation requested was unreasonable. Factors bearing on these questions include: (1) the extent plaintiff's ability to function is facilitated by the accommodation; (2) the training the animal received; and (3) the Authority's existing policy of permitting certain tenants to have dogs, so long as they were under a specific weight. Simply put, whether plaintiff should be permitted to keep the dog requires a "cost-benefit balancing that takes both parties' needs into account." Bronk, supra, 54 F.3d at 431. Only after a fact-sensitive evaluation of these factors, when viewed in light of the language and purposes of the relevant provisions of the FHAA and LAD and their concomitant regulations, can it be determined if the Authority failed to reasonably accommodate plaintiff's disability when it required him to remove Peaches from his apartment.
Finally, we turn to plaintiff's claim that the motion judge erred by concluding that plaintiff's punitive damage claim was barred by the New Jersey Tort Claims Act, N.J.S.A. 59:9-2(e). The judge said:
With regard to ... whether plaintiff's claims for punitive damages are barred by the Tort Claims Act, ... under 59:9-2c, and I quote, "No punitive damages or exemplary damages shall be awarded against a public entity."
This subsection of the New Jersey Torts Claims Act prohibits the awarding of punitive damages against a public entity....
The judge also dismissed plaintiff's punitive damages claims against the individual defendants because "they acted as agents of the Bayonne Housing Authority...."
Case law under both the LAD and the FHAA supports plaintiff's position on this issue. Public entities who violate the LAD may be held liable for punitive damages "`in the event of actual participation by upper management or willful indifference.'" Lockley v. State of N.J., Dept. of Corr., 177 N.J. 413, 424, 828 A.2d 869 (2003)(quoting Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 117, 735 A.2d 548 (1999)). Individual supervisors who aid and abet discriminatory conduct under the LAD may be individually liable for punitive damages. Hurley v. Atl. City Police Dept., 174 F.3d 95, 128 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000). A government official who violates a plaintiff's civil rights under the FHAA may be individually liable for punitive damages, so long as the official's conduct was "`motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Samaritan Inns, Inc. v. Dist. of Columbia, 114 F.3d 1227, 1239 (D.C.Cir.1997)(quoting Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632, 651 (1983)).
Here, if a violation of either the FHAA or the LAD is found, it will be up to the *205 jury to decide if defendants' actions were willfully or callously indifferent to plaintiff's state and or federally protected rights. Accordingly, we reinstate plaintiff's punitive damages claim.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] In that litigation, the Law Division judge denied without prejudice plaintiff's request to amend his complaint to include the claims plaintiff ultimately raised in this case.
[2] Although plaintiff asserted in his appellate brief and in his brief in opposition to defendants' summary judgment motion in the Law Division that the Authority's actions violated the Americans With Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 to 12213, plaintiff did not raise that claim in his complaint. At oral argument, plaintiff's counsel conceded that plaintiff has waived the ADA claim.